1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    BILLY SAECHAO,                        No.  2:13-cv-1204 TLN KJN P

12              Petitioner,

13         v.                               FINDINGS & RECOMMENDATIONS

14    PAUL BRAZELTON,

15              Respondent.

16

17    I.  Introduction

18         Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his conviction for second

20    degree murder, with firearm and gang enhancements.  Petitioner was sentenced to 50 years to life

21    in state prison.  Petitioner claims that his right to due process and trial by jury were violated by

22    the trial court's failure to *sua sponte* instruct the jury that a non-deadly aggressor regains the right

23    of self-defense if the victim escalates a confrontation from non-lethal to lethal.  As set forth

24    below, the petition should be denied.

25    II.  Procedural History

26         On May 7, 2010, petitioner was convicted by a jury of second degree murder.

27    (Respondent's Lodged Document ("LD") 2 at 557.)  Petitioner was sentenced to 15 years to life

28    for the second degree murder, 25 years to life for the firearm enhancement, and an additional ten

                                             1

1  years for the gang enhancement, for a total sentence of 50 years to life in state prison.  (LD 2 at

2  604.)

3        Petitioner filed an appeal.  On March 6, 2012, the judgment of conviction was affirmed,

4  but an error in the code section within the abstract of judgment was ordered corrected.  (LD 7 at

5  14.)

6        Petitioner filed a petition for review in the California Supreme Court.  (LD 8.)  The

7  California Supreme Court denied the petition for review on May 17, 2012.  (LD 9.)

8        Petitioner filed no collateral challenges in state court.  (ECF No. 15 at 8.)

9        Petitioner filed the instant petition on June 17, 2013.  (ECF No. 1.)

10  III.  Facts[1]

11        In its unpublished memorandum and opinion affirming petitioner's judgment of

12  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

13  following factual summary:

14            In March 2008, Gnia Lee [FN2] and his sister Jeanie lived in their
              parents' south Sacramento house. Jeanie invited four of her
15            girlfriends -- Tracey Yang, Shari, Nai, and Mey Saechao -- over for
              an outdoor party. Gnia spent the night indoors, while other
16            members of his family (brothers Ki and Ker, cousin Koua, relatives
              Steve and Roger Lee, and Steve Chang) and Ki's friend Teng
17            Xiong were at the party.

18                [FN2. Many of the participants in the incident share a last
                  name. For the sake of clarity, we refer to those who share
19                last names by their first names.]

20            Mey, Shari, and Nai decided to go home, and Mey called her
              boyfriend, [petitioner], to pick them up.  [Petitioner] was at a
21            nearby party with his friends Thanhdat Chau, Joe Duong, and Tim
              Saetern.  [Petitioner] told Mey he would come and get her; Mey had
22            Yang give him directions. Jeanie, Mey, and their girlfriends went
              out front to wait for the ride.
23
              Koua, Xiong, and Chang decided to leave the party at around the
24            same time. As they were getting into Koua's car, [petitioner's]
              group drove up to the residence.  According to Yang, Koua's group
25            exchanged words with [petitioner's] group while they crossed the
              street.  The exchange was not friendly, and the two groups
26

27  _____
    [1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
28  District in People v. Saechao, No. C065775 (March 6, 2012), a copy of which was lodged by
    respondent as LD 7 to the answer filed November 20, 2013.

exchanged gang words.  Suddenly, shooting erupted between the two groups. Yang saw [petitioner] fire first, and Koua fire back many times.

Xiong testified that he was out front drinking when a white Acura drove by, made a u-turn, and parked about half a block up the street.  Koua was across the street in his car.  Ki was inside the house, but came out when the Acura showed up.  The occupants got out of the Acura and started making gang signs while yelling out for their gang.  Two of the Acura's occupants then started shooting.  Xiong was shot in the left hip and fell to the ground.  He was shot by [petitioner].

Ki was in the backyard when he heard three or four shots. Ki ran to the street, where he saw Koua in his car, Xiong lying on the grass, and a person in a black sweater running away.  Ki then fired two shots into the air to scare people, and threw his gun, a .22 caliber semiautomatic pistol, into the bushes.  Ki denied being a member of a Crip gang, but admitted Crip graffiti was in front of the house.

Gnia was inside when he heard at least three or four shots from the front of the house.  He ran outside, where he heard people screaming that Xiong was shot.  Gnia grabbed Xiong, who was lying in the neighbor's yard and said he was shot and going to die. When Steve Lee said Koua had been shot, Gnia ran across the street to Koua's car, where he found Koua in the driver's seat, bleeding from the lower chest and unresponsive.

Emergency personnel pronounced Koua dead at the scene.  Police found Koua in the driver's seat of a white Volkswagen sedan parked across the street from the house.  A .9mm Smith and Wesson semiautomatic pistol was in the driver's seat.  The pistol had no ammunition and the slide was in the locked back position, suggesting it was fired until it ran out of bullets.  Koua died of a single gunshot that went through the skin and tissue of his forearm, penetrating his heart and liver before stopping in his abdominal cavity. He could reason and move for about 30 seconds after sustaining the fatal wound, enough time to fire a weapon and move to his car.

Police found 26 .9mm cartridges at the scene, of which 15 were fired from Koua's gun.  Officers found two .22 caliber cartridges, which were fired from Ki's gun.  Koua was killed by a .380 caliber bullet that matched a .380 caliber casing found at the scene.

Duong testified that [petitioner's] group had problems finding the place as they drove to pick up Mey.  They eventually drove past the home, made a u-turn, and parked.  The four males got out of the car and walked towards the house; as they approached they saw at least three males in a white car across the street.  The occupants of the white car looked really hard at [petitioner's] group, like they were "mean mugging" them, a gang term for challenging someone by staring them down.

////

3

The two groups exchanged words. Duong believed the other group said something first, like, "What's up, Cuz," which could be taken as an insult. [Petitioner] said the same phrase back to them. The other group then got out of the car, pulled out guns, and shots were fired. Duong did not see who fired first.

People scattered and ran after the shots were fired. Duong's group met at a friend's house, where [petitioner] admitted shooting somebody. Duong admitted he was once labeled as a member of the Asian Boys' Society gang. An exchange of hard looks can cause a gang member to expect violence, as can a "mean mugging" followed by an exchange of words.

Saetern drove [petitioner], Duong, and Chau to pick up his cousin Mey. He initially stayed in the car as the other three got out. People started shooting at them by the time Saetern got out of the car and walked to the house. He took off running when shots were fired.

Chau, a member of the Outlaw Crip gang, testified that someone from the other group said, "What's up" and someone from their group said something back. As they were talking to a girl, a man from the other group pulled out a gun and started firing at them. Chau was shot in the leg as he ran away, but managed to keep running. He admitted telling the police he was not sure how many shots [petitioner] fired, although he testified that he did not know if [petitioner] had a gun.

Sacramento Police Detective John Fan testified as an expert on Asian street gangs. [Petitioner] was a member of the Mien Pride Gangsters (MPG) at the time of the incident. The MPG were Crips, whose primary rivals were the Khome Zing Tong, Flat Dog Crips, and Menace of Destruction. Koua was a member of True Blue, another Crip gang.

True Blue was not associated with MPG; MPG had Mein membership, while True Blue was composed of Hmong members. Saetern, Chau, and Duong were not validated MPG members at the time of the incident, but some of them became validated with the gang as a result. Ki was a member of True Blue.

Respect is essential in the Asian gang subculture, and a loss of respect diminishes credibility for the person and his gang. Respect is regained through violent acts, sometimes extremely violent acts. However, Asian gangs rarely engage in one-on-one fighting. It is an unspoken rule that a gang member is expected to back up another gang member in a conflict.

"Mean mugging" or giving someone a hard look is a challenge. Such a challenge is the start of many violent crimes, because a person loses respect if he walks away from a "mean mugging." The phrase, "What's up Cuz," identifies the speaker as a Crip, and can be a challenge if said to a stranger.

////

4

In Detective Fan's opinion, if a group of gang members enters unknown or hostile territory and responds to a "mean mugging," it is likely the confrontation would escalate to armed conflict if the participants were armed.  It is extremely rare to have fistfights between two Asian gang members, and Detective Fan has never heard of a fistfight breaking out when an armed gang member in hostile territory confronts someone over a "mean mugging."

[Petitioner] was interviewed by the police one day after the incident.  His girlfriend wanted him to pick her up from the party because people there were drunk and touching her.  He believed there would be a fight, so he kept his gun at the ready as he traveled to the party.  He was angry because his group did not get good directions on how to get to the house.

[Petitioner's] group exchanged words with the other group after they arrived.  The participants were "mean mugging" each other, and [petitioner] removed his jacket in anticipation of a fight.  He thought the other men were members of a rival gang, and he wanted to back up his friends.

According to [petitioner], the other group shot first, and he returned fire with his .380 caliber gun.  He fired twice in the air, learned his friend Chau was shot, and fired four shots at the other group.  [Petitioner] claimed that he shot in self-defense.

Later in the interview, [petitioner] admitted his friend Duong started the confrontation.  He also admitted that he might have fired first.  [Petitioner] was a member of MPG.

[Petitioner] fled with Chau and threw the gun into a creek.  Later, he retrieved the gun, cleaned it, and threw it into the Sacramento River.  He also cut his hair to change his appearance.

(People v. Saechao, slip op. at 1-3.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

5

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's

////

6

1    decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2] Lockyer v.

2    Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

3    (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

4    court concludes in its independent judgment that the relevant state-court decision applied clearly

5    established federal law erroneously or incorrectly.  Rather, that application must also be

6    unreasonable."  Williams, 529 U.S. at 412; see also Schriro v. Landrigan, 550 U.S. 465, 473

7    (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

8    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

9    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

10    'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

11    Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

12    Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

13    must show that the state court's ruling on the claim being presented in federal court was so

14    lacking in justification that there was an error well understood and comprehended in existing law

15    beyond any possibility for fairminded disagreement."  Richter,131 S. Ct. at 786-87.

16         If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

17    court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

18    527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

19    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

20    § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

21    considering de novo the constitutional issues raised.").

22         The court looks to the last reasoned state court decision as the basis for the state court

23    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

24    If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

25    previous state court decision, this court may consider both decisions to ascertain the reasoning of

26    _____

27    [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28    384 F.3d 628, 638 (9th Cir. 2004)).

1  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

2  federal claim has been presented to a state court and the state court has denied relief, it may be

3  presumed that the state court adjudicated the claim on the merits in the absence of any indication

4  or state-law procedural principles to the contrary."  Richter, 131 S. Ct. at 784-85.  This

5  presumption may be overcome by a showing that "there is reason to think some other explanation

6  for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

7  803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

8  but does not expressly address a federal claim, a federal habeas court must presume, subject to

9  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 133 S. Ct.

10  1088, 1091 (2013).

11  V.  The Parties' Arguments

12       Petitioner claims that his right to due process and trial by jury were violated by the trial

13  court's failure to *sua sponte* instruct the jury that a non-deadly aggressor regains the right of self-

14  defense if the victim escalates a confrontation from non-lethal to lethal.

15       Respondent counters that the state court's rejection of petitioner's claim was reasonable

16  because a fairminded juror could conclude that petitioner was not entitled to such an instruction

17  because it was not supported by substantial evidence and did not comport with his operative

18  defense theory.  Respondent argues that there was no evidence of any combat, or assaultive

19  conduct prior to the gun battle, and that despite petitioner's attempt to reargue the factual record

20  with a new defense theory, he fails to demonstrate that fairminded judges would uniformly agree

21  that the state court decision that petitioner was not entitled to an escalating violence instruction

22  constituted unreasonable determinations of fact.  Moreover, respondent argues that petitioner

23  failed to demonstrate any substantial or injurious impact due to the failure to so instruct the jury

24  because petitioner agreed to the instructions given, argued only that the victim was the first

25  aggressor, and the jury was not constrained by a mutual combat instruction.

26       In reply, petitioner contends that the victim and the other side started the altercation by

27  first mean mugging and verbal sparring, but then suddenly resorting to deadly force -- Lee

28  discharging his weapon some 15 times -- before plaintiff returned fire only after his friend was

8

1  shot while they were fleeing.  Petitioner contends that this was substantial evidence which, if

2  believed, warranted giving the jury instruction CALCRIM 3471, which provides that if a

3  defendant "started the fight using non-deadly force and the opponent responded with such sudden

4  and deadly force that the defendant could not withdraw from the fight, then the defendant had the

5  right to defend [himself] with deadly force."  (ECF No. 21 at 7.)  Petitioner argues that his case is

6  similar to Rowe v. United States, 164 U.S. 546 (1896),[3] which renders the state court's denial of

7  this claim "contrary to" Supreme Court authority.  (ECF No. 21 at 8.)  Plaintiff claims that the

8  jury instruction that admonished the jury that plaintiff was not entitled to self-defense if he

9  provoked the deceased to anger deprived plaintiff of his right to a defense.  (ECF No. 21 at 10.)

10  Petitioner argues that it was error to deny his claim as distinguishable from Quach because

11  petitioner's claim was that his constitutional right to due process and to present a defense were

12  denied by the trial court's "refusal to instruct on an applicable defense" and by "contrary

13  instructions which foreclosed that defense," not that a right established by Quach was violated

14  (ECF No. 21 at 10.)

15  ////

16  _____

17  [3]  In Rowe, 164 U.S. at 548, there was a verbal challenge by defendant Rowe to Bozeman, the
   ultimate victim, in the hotel dining room in 1895.  Bozeman then finished his supper, and walked

18  into the hotel office.  Shortly thereafter, Rowe came out of the dining room into the office.  More
   words were exchanged; Rowe lightly kicked or kicked at Bozeman, then stepped back and leaned

19  against the counter.  Bozeman then sprang at Rowe, striking him with a knife, and cutting Rowe
   in the face.  Rowe drew his pistol and fired, and Bozeman ran.  Id.  Rowe turned, blood streaming

20  down his face, and told bystanders to go for a doctor because he was killed.  Id.  A second knife
   was found on Bozeman's person after his death.  Id.  The trial court instructed the jury that both

21  Rowe and Bozeman were rightfully on the premises, that neither were required to retreat under
   the circumstances, but that "they should use all reasonable means to avoid the condition which

22  led to a deadly conflict, whether that means could have been avoided by keeping out of the affray,
   or by not going into it, or by stepping to one side. . . ." Id. at 550.  The Supreme Court found that

23  the instructions misled the jury and failed to include the exception to the general rule that the
   aggressor cannot avail himself of self-defense if the killing was produced by his own wrongful

24  act, to wit, "where, although the defendant originally provoked the conflict, he withdraws from
   it in good faith, and clearly announces his desire for peace.  If he be pursued after this, his right of

25  self-defense, though once lost, revives." Id. at 556.  In other words, if one, after making a slight
   assault upon another, provoked by insulting words of the latter, in good faith withdraws from

26  further contest, his right of self-defense is restored if the assaulted person then, in violation of
   law, pursues him with a deadly weapon, and seeks to take his life, or do him great bodily harm.

27  Id.  The case was remanded for a new trial.  Id.

28

9

1    Further, plaintiff argues that courts have applied the sudden escalation defense to trespass

2  and simple assault cases, neither of which require proof of physical force; therefore, he contends

3  that defendants are not required to initially batter or strike the person ultimately killed in order to

4  use such defense.  (ECF No. 21 at 11.)  Petitioner argues that only two preconditions are

5  consequential:  that the accused engaged in "some non-deadly provocation" and that there be

6  "some evidence that the party thus provoked suddenly escalated the imbroglio by resort to deadly

7  force."  (ECF No. 21 at 12.)

8    In addition, petitioner contends that the state court's denial of this claim was contrary to,

9  and an unreasonable application of Supreme Court precedent because even assuming defense

10  counsel failed to articulate the sudden escalation defense theory, petitioner cannot be blamed for

11  such failure, citing Conde v. Henry, 198 F.3d 734 (9th Cir. 1999).[4]  (ECF No. 21 at 13.)

12  Petitioner appears to argue that the trial court's alleged foreclosure of the sudden escalation

13  defense limited defense counsel's closing argument which deprived petitioner of an effective

14  summation against the state.  (ECF No. 21 at 14.)

15    Finally, petitioner contends that the state court erred by stating that petitioner admitted

16  during his police interview that he "might have" shot first.  (ECF No. 21 at 14.)  Petitioner argues

17  that taking his statements in context, he was certain he did not shoot first, and that the evidence

18  demonstrated that the victim Koua Lee shot first because he was surrounded by 15 shell casings

19  yet died almost instantly from just one shot through his heart.  (ECF No. 21 at 15.)  Petitioner

20  argues that this court should not defer to the state court's decisions on state law because petitioner

21  was deprived of his right to present a defense, in violation of the Due Process Clause.  (ECF No.

22  21 at 16-20.)

23  ////

24  ////

---

25  [4]  In Conde, the Ninth Circuit found that the trial court violated due process where the defendant's
26  proposed defense was supported by law and had some foundation in the evidence, but the trial
court improperly precluded defendant's attorney from making closing argument explaining the
27  defendant's theory of the case, refused to instruct the jury on the defendant's theory and, over the
defendant's objection, gave erroneous instructions that did not require that the jury find every
28  element of the offense.  198 F.3d at 741.

1   VI.   Analysis

2         A.   State Court Decision

3         The last reasoned rejection of petitioner's claim is the decision of the California Court of

4   Appeal for the Third Appellate District on petitioner's direct appeal, which ruled as follows:

5                 Jury Instruction on Self-Defense Theory

6                 [Petitioner] contends the trial court was required to instruct the jury
                  that [petitioner] retained his right to use deadly force in self-defense
7                 if he provoked an argument he thought would lead to a fistfight, but
                  the other side responded with firearms.  We disagree.
8

9                 "A court must instruct sua sponte on general principles of law that
                  are closely and openly connected with the facts presented at trial.
10                [Citation.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 90.)  The trial
                  court must include sua sponte instructions "'on particular defenses
11                and their relevance to the charged offense . . . only if it appears that
                  the defendant is relying on such a defense, or if there is substantial
12                evidence supportive of such a defense and the defense is not
                  inconsistent with the defendant's theory of the case.'" (*People v.*
13                *Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on other
                  grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)
14                However, "'the court is required to instruct sua sponte only on
                  general principles which are necessary for the jury's understanding
15                of the case.  It need not instruct on specific points or special
                  theories which might be applicable to a particular case, absent a
16                request for such an instruction.' [Citation.]" (*People v. Garvin*
                  (2003) 110 Cal.App.4th 484, 488-489.)
17
                  [Petitioner's] claim is based on *People v. Quach* (2004) 116
18                Cal.App.4th 294.  *Quach* involved numerous inconsistent accounts
                  of a dispute between two groups of rival gang members outside a
19                bar, with defendant injuring a rival gang member in the ensuing
                  shootout.  (*Id.* at pp. 297-298.)  The jury was instructed under
20                CALJIC No. 5.56 that the right of self-defense is not available to a
                  person engaged in mutual combat unless that person tries to stop
21                fighting, informs the other person of his intention to stop, informs
                  the other person he has stopped fighting, and gives the opponent the
22                opportunity to stop fighting.  (*Id.* at p. 300, fn. 2.)

23                The *Quach* court mentioned in passing that "[t]he jury could quite
                  reasonably have concluded this was a mutual combat situation."
24                (*Quach*, supra, 116 Cal.App.4th at pp. 300-301.)  The Court of
                  Appeal held it was prejudicial error for the trial court to give the
25                instruction on mutual combat without also instructing that
                  "'[w]here the original aggressor is not guilty of a deadly attack, but
26                of a simple assault or trespass, the victim has no right to use deadly
                  or other excessive force. . . .  If the victim uses such force, the
27                aggressor's right of self-defense arises.' [Citation.]" (*Id.* at p. 301.)

28                [Petitioner] argues his situation is indistinguishable from *Quach*.
                  [Petitioner] told the police he thought the confrontation would lead

                                              11

1   to a fight, and so he took his jacket off during the initial
    confrontation.  Several witnesses testified that the other side fired
2   first.  Since the jury was instructed with CALCRIM No. 3472 that
    [petitioner] does not have a right to self-defense if he provoked a
3   quarrel with the intent to use force, [petitioner] asserts the jury was
    precluded from considering his right to self-defense even if he
4   provoked an argument without intending to use lethal force.

5   The rule in *Quach*, *supra*, 116 Cal.App.4th 294 is predicated on
    some combat short of lethal force that then escalates into lethal
6   force.  Although [petitioner's] statement to the police indicated he
    might have anticipated a fistfight rather than a gun battle, there is
7   no evidence of a fistfight or any other assault taking place before
    the gun battle.  Since this case does not involve mutual combat,
8   *Quach* is inapposite.

9   Nor, as [petitioner] suggests, was the *Quach* scenario the theory of
    the defense.  Defense counsel argued to the jury:  "Koua Lee and
10  his side provoked this quarrel.  [Petitioner] did not set out to kill
    Koua Lee.  He didn't deliberate or carefully consider his choices.
11  This quarrel started with what?  Koua Lee mean mugging. [¶] . . .
    [¶] It ended with Koua Lee, and possibly others -- because we had
12  more than one witness say that there [were] at least three guns on
    their side -- pulling out his 9mm semiautomatic handgun and
13  putting [petitioner] in immediate danger of great bodily injury or
    death."
14
    The trial court instructed the jury on [petitioner's] theory, that Koua
15  was the aggressor, whom [petitioner] shot in self-defense.  Neither
    the evidence nor the theory of the defense supported an instruction
16  on [petitioner] retaining his right to self-defense if he intended to
    provoke a nonlethal confrontation.  We conclude there was no error
17  on the self-defense jury instruction.

18  (People v. Saechao, slip op. at 3-4.)

19      B. Legal Standards

20      Federal habeas corpus relief does not lie for errors of interpretation or application or state

21  law; and a claim that a state court failed to follow its own state law in regard to jury instructions

22  given at trial does not necessarily invoke a federal constitutional question.  See Estelle, 502 U.S.

23  at 67-68; Gilmore v. Taylor, 508 U.S. 333, 343 (1993).

24      Due process requires that "'criminal defendants be afforded a meaningful opportunity to

25  present a complete defense.'"  Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting

26  California v. Trombetta, 467 U.S. 479, 485 (1984)).  Therefore, a criminal defendant is entitled to

27  adequate instructions on the defense theory of the case.  Conde, 198 F.3d at 739 (error to deny

28  defendant's request for instruction on simple kidnaping where such instruction was supported by

12

1    the evidence).  But due process does not require that an instruction be given unless the evidence

2    supports it.  See Hopper v. Evans, 456 U.S. 605, 611 (1982) (a lesser included offense instruction

3    need not be given unless the evidence would support convicting on the lesser offense and

4    acquitting on the greater offense); Menendez v. Terhune, 422 F .3d 1012, 1029 (9th Cir. 2005)

5    ("[A] state trial court's finding that the evidence does not support a claim [ ] is entitled to a

6    presumption of correctness on federal habeas review.").  Failure to instruct on the theory of

7    defense violates due process if "'the theory is legally sound and evidence in the case makes it

8    applicable.'"  Clark, 450 F.3d at 904-05 (quoting Beardslee v. Woodford, 358 F.3d 560, 577 (9th

9    Cir. 2004)).  However, the defendant is not entitled to have jury instructions raised in his precise

10   terms where the given instructions adequately embody the defense theory.  United States v. Del

11   Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v. Tsinnijinnie, 601 F.2d 1035, 1040

12   (9th Cir. 1979).  "A defendant is entitled to an instruction on his [defense] theory of the case

13   [only] if the theory is legally cognizable and there is evidence upon which the jury could

14   rationally find for the defendant."  United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009)

15   (internal quotations omitted).

16          In order to warrant federal habeas relief, a challenged jury instruction, or omitted or

17   ambiguous instruction, must violate due process to the extent that it so infected the entire trial that

18   it rendered the resulting conviction "fundamentally unfair."  Estelle, 502 U.S. at 67, 71-73;

19   McKinney v. Rees, 993 F.2d 1378, 1379-80 (9th Cir. 1993) (discussing Estelle).  The omission of

20   an instruction is less likely to be prejudicial than a misstatement of the law.  See Walker v.

21   Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 155

22   (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction

23   bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997)

24   (quoting Henderson, 431 U.S. at 155).  The significance of the omission of such an instruction

25   may be evaluated by comparison with the instructions that were given.  Murtishaw v. Woodford,

26   255 F.3d 926, 971, 972 (9th Cir. 2001) (due process violation found in capital case where

27   petitioner demonstrated that application of the wrong statute at his sentencing infected the

28   proceeding with the jury's potential confusion regarding its discretion to impose a life or death

1  sentence).

2          Even if constitutional instructional error has occurred, a petitioner is not entitled to federal

3  habeas relief unless the error "in the whole context of the particular case, had a substantial and

4  injurious effect or influence on the jury's verdict."  Calderon v. Coleman, 525 U.S. 141, 147

5  (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  See also California v. Roy, 519

6  U.S. 2, 6 (1996); Cavitt v. Cullen, 728 F.3d 1000, 1010 (9th Cir. 2013), cert. denied, 134 S. Ct.

7  1522 (2014).

8          C.  Discussion

9          First, as noted above, the undersigned may not grant habeas relief based on an alleged

10 error in the interpretation or application of state law.  Estelle, 502 U.S. at 68; Jammal v. Van de

11 Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Therefore, to the extent that petitioner claims that the

12 trial court's failure to instruct the jury in accordance with Quach was incorrect under state law,

13 his claim is not cognizable on federal habeas review.  See Estelle, 502 U.S. at 71-72; Henderson,

14 431 U.S. at 154.

15         Second, the record makes clear that defense counsel did not argue a theory of mutual

16 combat or escalating confrontation from which petitioner had withdrawn, and the trial court did

17 not refuse to issue such an imperfect self-defense instruction.  Rather, the record reflects that the

18 trial court specifically asked defense counsel, "it's my understanding . . . that you are not asking

19 for [an imperfect self-defense] instruction; is that correct?"  (RT 673.)  Defense counsel

20 confirmed that the reason he was not seeking an imperfect self-defense instruction was that "any

21 self-defense used by [petitioner] in this case was perfect self-defense and would lead to an

22 acquittal."  (RT 673.)[5][6]  Subsequently the trial court announced that it would instruct with

23 _____

24 [5]  The trial court's inquiry may have been prompted by the bench notes contained in CALCRIM
    571, the jury instruction explaining the elements of voluntary manslaughter, which state:

25              Most courts hold that an instruction on imperfect self-defense is
                required in every case in which a court instructs on perfect self-
26              defense.  If there is substantial evidence of a defendant's belief in
                the need for self-defense, there will always be substantial evidence
27              to support an imperfect self-defense instruction because the
                reasonableness of that belief will always be at issue.  [Citations
28              omitted.]  The court in People v. Rodriguez disagreed, however,

                                                14

CALCRIM 3472[7] (RT 674), and defense counsel made no objection on the record to such provocation instruction.  (RT 672-75.)  Moreover, there was no mention of mutual combat, initial aggressor, or jury instruction CALCRIM 3471, during the discussion of the jury instructions put on the record.  (RT 672-75.)

Also, during closing argument, defense counsel argued that petitioner acted in self-defense.  Counsel argued that the victim Koua Lee and his side provoked the quarrel, not petitioner.  (RT 771-73; 775-76; 779-81.)  Defense counsel argued that the events took place very fast, and that who shot his gun first did not matter because the victim made "poor choices," and "chose to start an armed quarrel."  (RT 781.)  Defense counsel did not argue escalating violence.  (RT 771-73; 775-76; 779-81.)  In the petition, petitioner claims that "[d]efense counsel argued that even if [petitioner] provoked the argument and anticipated a fist-fight (in accord with the state's second theory), he was nevertheless entitled to rely on self-defense if the jury found that Koua had escalated the non-deadly confrontation into a deadly one by drawing his gun and firing it at [petitioner] and his friends."  (ECF No. 1 at 13, citing RT 771-2, 775, 777, 791-81.)  However, review of the record does not reflect such alternative argument; rather, defense counsel consistently argued that Koua Lee and his side provoked the quarrel.  (RT 760-81, *passim*.)  In his traverse, petitioner concedes that defense counsel argued a theory of self-defense based on witness testimony that Koua Lee and his side fired first.  (ECF No. 21 at 5.)

---

and found that an imperfect self-defense instruction was not required sua sponte on the facts of the case where the defendant's version of the crime "could only lead to an acquittal based on justifiable homicide," and when the prosecutor's version of the crime could only lead to a conviction of first degree murder.  (See People v. Rodriguez (1997) 53 Cal.App.4th 1250, 1275 [62 Cal.Rptr.2d 345]. . . .

[6]  Even the prosecutor noted the defense theory:  "Under [defense counsel's] argument, because the mean mugging started by Koua Lee and the others that were with him, if you accept the defense argument, make no mistakes about it, that means that as long as you have two gangsters, two groups of gangs, one starts by mean mugging, then whatever follows, the second group is justified."  (RT 782.)

[7]  "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  CALCRIM 3472.

Furthermore, the jury was properly instructed on the defense theory of self-defense:

> I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide. … The [petitioner] is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The [petitioner] acted in lawful self-defense if:  One, the [petitioner] reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; two, the [petitioner] reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and three, the [petitioner] used no more force than was reasonably necessary to defend against that danger.   Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The [petitioner] must have believed there was imminent danger of great bodily injury to himself. [Petitioner]'s belief must have been reasonable, and he must have acted only because of that belief. The [petitioner] is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the [petitioner] used more force than was reasonable, the killing was not justified. When deciding whether the [petitioner]'s beliefs were reasonable, consider all the circumstances as they were known to and appeared to the [petitioner] and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the [petitioner]'s beliefs were reasonable, the danger does not need to have actually existed. A [petitioner] is not required to retreat. He is entitled to stand his ground and defend himself, and, if reasonable necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.  The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the [petitioner] not guilty of murder or manslaughter.
>
> [¶]  A person does not have the right to self defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.

(RT 697-99; Clerk's Transcript 539-41 (CALCRIM 505, 3472).)

Defense counsel's theory was self-defense, and the jury was properly instructed on the self-defense theory.  Petitioner has not shown he was denied instructions consistent with such theory of the defense.  Thus, petitioner's reliance on <u>Conde</u>, 198 F.3d at 734, is unavailing.

Moreover, because petitioner's defense theory at trial was self-defense, the undersigned rejects petitioner's claim that the giving of CALCRIM 3472 impaired his theory of self-defense. Self-defense is unavailable under California law to defendants who are the initial aggressors and provoke or invite the victim's attack.  <u>In re Christian S.</u>, 7 Cal. 4th 768, 773 n.1 (1994) ("It is well

16

1  established that the ordinary self-defense doctrine -- applicable when a defendant reasonably

2  believes that his safety is endangered -- may not be invoked by a defendant who, through his own

3  wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has

4  created circumstances under which his adversary's attack or pursuit is legally justified.").

5  Because petitioner's theory at trial was self-defense, it was appropriate to instruct the jury with

6  CALCRIM 3472, because that is law in California.  In addition, the jury was instructed on first

7  and second degree murder and voluntary manslaughter.  Thus, if the jury had any doubt that

8  petitioner was guilty of murder, it could have convicted him of voluntary manslaughter.

9          Third, petitioner did not request at trial that any instruction be given regarding the sudden

10  escalation exception.  But even if petitioner had so requested, there would be no error in refusing

11  to give such an instruction, because there was no substantial evidence adduced at trial that

12  petitioner only resorted to gunfire in self-defense after Koua Lee escalated the confrontation with

13  sudden and deadly force.  After review of the record, this court agrees with the state appellate

14  court's assessment that the facts did not support a theory of escalating violence.  As noted by the

15  Court of Appeal, "[t]he rule in Quach, supra, 116 Cal. App. 4th 294[,] is predicated on some

16  combat short of lethal force that then escalates into lethal force."  People v. Saechao, slip op. at 9.

17  Despite petitioner's claim that he took off his jacket because he anticipated a fistfight rather than

18  a gun battle, the record reflects no fistfight or other type of combat occurred prior to the gun

19  battle.  Unlike the defendant in Rowe, 164 U.S. at 546, who merely kicked or kicked at the

20  ultimate victim, who then fiercely attacked Rowe with a knife, here petitioner shot the victim, and

21  both petitioner and the victim were armed with loaded weapons.  Importantly, here there also was

22  expert testimony from Detective Fan that both petitioner and the victim were rival gang members

23  who would expect violence to ensue if disrespected, that one on one altercations are rare, and that

24  fistfights never happen.  (RT 635, 636, 664.)

25          In his traverse, petitioner argues that he and "more than one witness," whom he fails to

26  identify, "asserted that petitioner took to his heels and fled, only returning fire after his friend,

27  who was running at his side, was shot."  (ECF No. 21 at 9.)  However, petitioner does not cite to

28  the record evidence that allegedly supports such statement.  Witnesses Yang, Xiong, and Duong

did not testify that petitioner only fired after he had turned and fled.  Witness Saetern testified that he initially stayed in the car, but ran off when shots were fired; he did not testify that petitioner also fled before firing.  Moreover, evidence demonstrated that both Xiong and Koua Lee were shot with bullets from petitioner's gun.  (RT 212.)  Interestingly, defense counsel did not argue that petitioner only returned fire after his friend Dat, who was running at his side, was shot.  (RT 760-81.)

Petitioner is correct that a defendant has a due process right to "an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  Mathews v. United States, 485 U.S. 58, 53 (1988).  But there is no federal constitutional right to jury instructions that are not supported by the evidence.  "Under California law, a trial judge need not give" an instruction, even if requested, "for which there is no substantial evidence in support."  Hendricks v. Vasquez, 974 F.2d 1099, 1107 (9th Cir. 1992) (citation omitted).  The undersigned finds no factual error in the state appellate court's determination that petitioner was not entitled to the sudden and deadly force instruction.  Clark, 450 F.3d at 904; Beardslee, 358 F.3d at 577.

Fourth, and finally, even assuming the failure to so instruct the jury was of constitutional magnitude, petitioner failed to demonstrate that he suffered actual prejudice as a result of the omission of the instruction.  See Brecht, 507 U.S. at 637-38.  Several witnesses did give varying testimony.  However, in light of the testimony of Detective Fan, as well as petitioner's statements to police, it is unlikely that the jury's verdict would have been different had it been instructed that "when a defendant engaged in a simple assault and his opponent responds with deadly force so suddenly that the person cannot withdraw, a defendant may immediately use deadly force in self-defense."  As argued by respondent, petitioner consented to the jury instructions given, and his defense theory at trial was self-defense, based on his position that Koua Lee was the first aggressor.  Moreover, the jury was not instructed on mutual combat like CALJIC 5.56,[8] so the

---

[8]  California CALJIC 5.56 states:

> The right of self-defense is only available to a person who engages
> in mutual combat:

18

1  jury was not constrained by the definitional requirements of mutual combat as it was in <u>Quach</u>.

2  Indeed, the self-defense instructions given would have supported petitioner's theory of self-

3  defense had the jury found it to be credible.  Despite the lengthy deliberations, the jury asked only

4  one question, and that was to review the video interrogation of petitioner and its transcript.

5  (Clerk's Transcript ("CT") 503; transcript of interrogation CT 314-498.)  Although petitioner's

6  statements during the interrogation varied, certain facts were clear.  Petitioner was going to the

7  house to pick up his girlfriend who was at a party where "everyone was getting drunk" and

8  "touching" her.  (CT 334, 385, 459.)  Petitioner had a gun in his pocket.  Petitioner was given the

9  wrong directions, and "got mad" (CT 366); everyone in petitioner's car "was getting pissed off."

---

[[1.] If [he] [she] has done all the following:

A [He] [She] has actually tried, in good faith, to refuse to continue fighting;

B [He] [She] has by words or conduct caused [his] [her] opponent to be aware, as a reasonable person, that [he] [she] wants to stop fighting; and

C [He] [She] has caused by words or conduct [his] [her] opponent to be aware, as a reasonable person, that [he] [she] has stopped fighting; and

D [He] [She] has given [his] [her] opponent the opportunity to stop fighting.

After [he] [she] has done these four things, [he] [she] has the right to self-defense if [his] [her] opponent continues to fight[.]] [, or]

[[2.] If the other party to the mutual combat responds in a sudden and deadly counterassault, that is, force that is excessive under the circumstance, the party victimized by the sudden excessive force need not attempt to withdraw and may use reasonably necessary force in self-defense.]

Mutual combat consists of fighting by mutual intention, agreement, or consent. It follows an express or implied agreement to fight. However before mutual combat can be found to exist, you must find that [both] [all] combatants actually intended, agreed, or consented to fight before the claimed occasion for self-defense arose. The agreement need not have all the characteristics of a legally binding contract.

CALJIC 5.56.

19

1   (CT 367, 415, 444.)  As they drove down the street and by the house where the girlfriend was,

2   Koua Lee and his fellow gang members "mean mugged" petitioner and the people in his car.  (CT

3   403-04, 417, 466-67.)  By the time they parked the car and emerged, petitioner was armed, angry,

4   knew it was going to go bad, and that petitioner had to back up his fellow gang members.  (CT

5   403-04, 417, 466-67.)  Repeatedly during the interrogation, petitioner said that "Joe"[9] started it by

6   saying "What's up?" or "What's up, cuz?" to Koua Lee and his fellow gang members.  (CT 437,

7   440, 462, 465, 470.)  Witnesses Yang, and Chau testified that petitioner or someone from his

8   group shot first.  (RT 192, 196, 564.)  During the interrogation, petitioner also stated that if he

9   was the first one to shoot, petitioner "would have got him."  (CT 435-36; 442.)  Koua Lee was

10  killed by one shot from petitioner's gun.  The pathologist testified that after Koua Lee was shot,

11  he would be dead in a matter of minutes, but that he could still squeeze the trigger and fire off a

12  few rounds and return to his car before he died.  (RT 613.)  Accordingly, petitioner has failed to

13  show that the omission of the escalation of violence jury instruction had a substantial and

14  injurious effect or influence in determining the jury's verdict.

15         For all of the above reasons, the state appellate court's decision was not an unreasonable

16  application of federal law nor an unreasonable determination of the facts presented at trial.  See

17  Menendez, 422 F.3d at 1029; 28 U.S.C. § 2254(e)(1).  Petitioner received adequate instructions

18  on the defense theory of the case, including instructions on self-defense and voluntary

19  manslaughter, and was in no way prohibited from "present[ing] a complete defense."  Trombetta,

20  467 U.S. at 485.  Petitioner cannot meet his "especially heavy" burden of showing that he was

21  deprived of a fair trial, and therefore is not entitled to habeas relief on this claim.  Henderson, 431

22  U.S. at 155.

23  VII.  Conclusion

24         Therefore, the state court's rejection of petitioner's claim was not contrary to, or an

25  unreasonable application of, Supreme Court authority.  Accordingly, petitioner is not entitled to

26  federal habeas relief with respect to his jury instruction claim.

27  _____

28  [9]  Joe Duong accompanied petitioner to the scene in the car.

20

1      Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

2  habeas corpus be denied.

3      These findings and recommendations are submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

8  he shall also address whether a certificate of appealability should issue and, if so, why and as to

9  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

10 applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

11 § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

12 service of the objections.  The parties are advised that failure to file objections within the

13 specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

14 F.2d 1153 (9th Cir. 1991).

15 Dated:  October 20, 2014

16

17 /saec1204.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28